**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | Case No. 2:10-CV-225DAK |
| **LOANPOINTE, LLC, EASTBROOK LLC, JOE S. STROM, BENJAMIN J. LONSDALE, JAMES C. ENDICOTT, and MARK S. LOFGREN,** | Judge Dale A. Kimball |
| Defendants. | |

This matter is before the court on Plaintiff Federal Trade Commission's Motion for Summary Judgment against Defendants LoanPointe, LLC, Eastbrook, LLC, and Joe S. Strom (collectively, "Defendants") and Defendants' Motions to Reopen Discovery and for Relief from Having the FTC's Second Set of Requests for Admission "Deemed Admitted" and to Have Defendants' Denials Accepted. On September 7, 2011, the court held a hearing on the motions. At the hearing, Plaintiff was represented by Christopher Koegel and Gregory A. Ashe, and Defendants were represented by John J.E. Markham, II. After hearing argument from counsel, the court took the motions under advisement. Having carefully considered the memoranda and other materials submitted by the parties, as well as the law and facts relevant to the motions, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Federal Trade Commission ("FTC") enforces federal statutes prohibiting unfair or deceptive acts or practices in or affecting commerce, specifically debt collection and credit practices. Defendant Eastbrook, LLC is no longer an operating entity because its books were merged into Defendant LoanPointe, LLC. LoanPointe is a Utah limited liability company doing business as GetECash through its internet website www.GetECash.com. Defendant Joe S. Strom is a manager, officer, principal, and registered agent of both Eastbrook and LoanPointe.

Since at least September 2008, Defendants have used their website to offer short-term, small dollar, unsecured, high-interest rate extensions of credit, commonly referred to as payday loans. The principal of the loans is usually less than $1,000 and the term of the loan is meant to extend only to the next payday. Consumers obtain the loans by completing an online application on Defendants' website. Before receiving the loan, consumers must agree to the Terms of the Application, the Privacy Policy, the Authorization Agreement, and the Loan Note and Disclosure. Consumers indicate their agreement by checking a box, as an electronic signature, next to links to each of those documents.

The version of the Loan Note and Disclosure at issue in this case, which consumers had to accept before receiving a loan, included a clause that read, "NOTICE: I agree to have my wages garnished to pay any delinquent amount on this loan." The clause was written in the fine print and it was in bold and underlined.

Strom knew that the loan agreements contained the wage assignment clause. However, he believed that his companies could lawfully use the wage assignment clause and garnish the wages of borrowers under its authority. Strom had sought and received advice from an attorney

before authorizing the loan documents. When the FTC notified Strom that certain documents were not legal, Strom withdrew his approval from those documents.

Using the wage assignment clause as authority, Defendants garnished the wages of consumers who were in default on their loans. Although 80% of the consumers that Defendants attempted to garnish wages from refused to allow the garnishment, the wage assignment clause was used to recover approximately 16% of all loan repayments from approximately 10% of all borrowers.

In order to garnish a consumer's pay from a consumer's employer, Defendants would send a garnishment package to the employer that included the following documents: 1) a "Letter to Employer & Important Notice to Employer"; 2) a "Wage Garnishment" document; 3) a "Wage Garnishment Worksheet"; and 4) an "Employer Certification." These document titles match exactly the document titles that the Treasury Department's Financial Management Service ("FMS") includes in the wage garnishment package that it sends to employers when federal agencies seek to garnish wages.

In addition to the other documents in the wage garnishment package, Defendants would also send copies of the consumer's loan application to the consumer's employer, which included the loan amount. Although Strom's declaration states that "all collection efforts, including the wage assignments . . . sent to employers" were from GetECash, Defendants sent their garnishment package using a fax coversheet from LoanPointe, a LoanPointe fax tagline, and the words "LoanPointe Garnishment Manager" as the signature. .

In addition to sending a garnishment package with document titles identical to those sent by the FMS, Defendants' "Letter to Employer" also included wording similar to the wording

included in the FMS's "Letter to Employer." The FMS's letter states the following:

> One of your employees has been identified as owing a delinquent nontax debt to the United States. The Debt Collection Improvement Act of 1996 (DCIA) permits Federal agencies to garnish the pay of individuals who owe such debt without first obtaining a court order. Enclosed is a Wage Garnishment Order directing you to withhold a portion of the employee's pay each period and to forward those amounts to us. We have previously notified the employee that this action was going to take place and have provided the employee with the opportunity to dispute the debt.

Defendants' letter states the following:

> One of your employees has been identified as owing a delinquent debt to GetECash. The Debt Collection Improvement Act of 1996 (DCIA) permits agencies to garnish the pay of individuals who owe such debt without first obtaining a court order. Enclosed is a Wage Garnishment Assignment directing you to withhold a portion of the employee's pay each period and to forward those amounts to GetECash. We have previously notified the employee that this action was going to take place and have provided the employee with the opportunity to dispute the debt.

After being informed by the Treasury Department that the portion of Defendants' letter referring to the DCIA was inaccurate and unacceptable to the government, Defendants discontinued the use of the challenged documents. Specifically, Defendants removed the language referring to the DCIA and asked the Treasury agent if she had any other concerns with the letter. When Defendants did not get a response, they assumed that the remaining information in the letter was proper.

Prior to undertaking any garnishment of wages, Defendants assert that they attempted to contact the consumers several times by telephone, voice mail, and email. According to Defendants, these communications would inform consumers that their continued failure and refusal to repay loans would result in garnishment of their wages. Despite these communications, the FTC references two consumers who were unaware of the Defendants'

ability to garnish their wages until Defendants' made contact with their employers, and it references another consumer who was unaware of Defendants' ability to garnish wages after reviewing the loan application. The FTC also references comments from several consumers suggesting that Defendants' contact with consumers' employers exposed them to embarrassment and risk of adverse action, such as job loss.

Using the loan application with the wage assignment clause, Defendants have made at least 7,121 payday loans to consumers from which they have collected a total of $3,013,044. Of that total, $976,107.54 represents principal that consumers repaid to Defendants. Defendants used wage garnishment to collect $468,020.91 of the total amount.

On March 15, 2010, the FTC filed a Complaint against Defendants claiming that Defendants' practices violated Section 5 of the Federal Trade Commission Act ("FTC Act"), the Fair Debt Collection Practices Act ("FDCPA"), and the FTC's Trade Regulation Rule Concerning Credit Practices ("Credit Practices Rule"). As relief for these violations, the FTC sought a preliminary injunction during the pendency of the action, a permanent injunction to prevent future violations, and any other relief the court finds necessary such as rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. The parties agreed to the entry of a preliminary injunction in April 2010.

## DISCUSSION

The FTC has moved for summary judgment on all of its claims. Defendants submitted a Memorandum in Opposition to the FTC's Motion for Summary Judgment and, at the same time, moved to reopen discovery and for relief from the FTC's Second Set of Requests for Admissions. The court will address each motion in turn.

**FTC's Motion for Summary Judgment**

The FTC moves for summary judgment against Defendants, arguing that there are no genuine issues of material fact as to Defendants' violations of the FTC Act, the FDCPA, or the Credit Practices Rule and requesting monetary relief in connection with those violations.

## I.        Violations of the FTC Act

The FTC argues that Defendants violated the FTC Act by engaging in the following unfair or deceptive practices: misrepresenting to consumers' employers that they were authorized to garnish wages under the DCIA without a court order; misrepresenting to consumers' employers that they had notified consumers and given consumers an opportunity to dispute the debt prior to sending the garnishment request; and communicating with and disclosing the existence and amount of consumers' loans to consumers' employers without consumers' knowledge or consent.

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce." 15 U.S.C. § 45. The Act defines a practice as "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n); *see also FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009). The injury caused by the practice can be sufficiently substantial if it causes a small harm to a large class of people. *FTC v. Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17114, at *29-31 (N.D. Ga. Sept. 30, 1997) (unpublished).

Under Section 5 of the FTC Act, an act or practice is "deceptive" if it involves a material representation or omission that is likely to mislead consumers, acting reasonably under the

circumstances, to their detriment. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994);

*Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *Southwest Sunsites v. FTC*, 785 F.2d 1431,

1435 (9th Cir. 1986). Express and deliberate claims are presumed to be material. *FTC v.*

*SlimAmerica*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999); *FTC v. Wilcox*, 926 F. Supp. 1091,

1098 (S.D. Fla. 1995); *In re Thompson Med. Co.*, 104 F.T.C. 648, 788-89 (1984), *aff'd*, 791 F.2d

189 (D.C. Cir. 1986). The FTC is not required to prove that each consumer relied on

Defendants' deceptive claims to establish a violation of Section 5 of the FTC Act. *SlimAmerica*,

77 F. Supp. 2d at 1275. Instead, a "presumption of actual reliance arises once the FTC has

proved that the defendant made material misrepresentations, that they were widely disseminated,

and that consumers purchased the defendant's product," or were induced to some other action,

such as garnishment of wages by an employer. *Id.*; *see also FTC v. Figgie Int'l, Inc.*, 994 F.2d

595, 605 (9th Cir. 1993).

### A. Deceptive Practices

The FTC argues that Defendants were deceptive by making explicitly false claims that the

DCIA authorized non-federal entities to garnish wages without a court order and that Defendants

provided consumers with an opportunity to dispute their debts before seeking wage garnishment.

In addition, the FTC claims that Defendants engaged in unfairness through disclosing consumers'

debts to third parties, including their employers.

It is undisputed that Defendants made representations that they had authority under the

DCIA and that they had notified consumers and given consumers a chance to dispute the debt.

Defendants concede that they did not have authority under the DCIA to garnish wages. In

addition, although Defendants argue that they notified consumers prior to contacting consumers'

employers to garnish wages, Defendants do not argue that they gave consumers an opportunity to *dispute* the debt before attempting to garnish wages. Therefore, both statements were false and potentially misleading. Accordingly, the only disputes are whether the representations were likely to mislead consumers and whether they were material.

Defendants argue that the representations were not likely to mislead *consumers* because they were sent to the consumers' *employers*. Therefore, the crucial question in this analysis is whether sending misleading information to the consumers' employers qualifies as a deceptive act for purposes of the FTC Act.

Both individuals and businesses can be consumers for purposes of Section 5 liability. *See, e.g., FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 982 (N.D. Cal. 2010). The employers in this case are the consumers to whom Defendants' deceptive garnishment letters were directed. Defendants sent the employers letters that looked identical to a garnishment request from the government. The letter also alleged that Defendants had the right to garnish under the DCIA. While Defendants' business is extending credit and loans and they would be expected to know the applicable law applying to such business, the consumers' employers would be in various fields unrelated to the credit and loan business. Thus, the consumers' employers could be, and likely were, misled by Defendants' letter into believing that Defendants had the right to garnish. Moreover, Defendants' represented to the consumers' employers that they had given the employee a right to dispute the debt. The consumers' employers would not be in a position to know whether that was factually correct. Even if the employer questioned its employee regarding the factual representation, it would not be able to verify which version of the facts was accurate. Defendants' factual misrepresentation, therefore, could, and likely did, mislead reasonable

employers into believing that Defendants had given the employees an opportunity to dispute the debt. Therefore, the second prong of the test for whether an act or practice is deceptive is met because Defendants conduct was likely to mislead an individual or an entity in a way that affects commerce.

Under the third element, Defendants' practices will be considered deceptive if they are material. To be material, a misrepresentation would have to be "likely to affect a consumer's choice of or conduct regarding a product." *In re Thompson Medical Co.*, 104 F.T.C. 648, 788 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986). The FTC considers express claims to be material because "the willingness of a business to promote its products reflects a belief that the consumers are interested in the advertising." *Id.* at 789.

Here, Defendants expressly stated that they had authority under the DCIA and that they had given consumers an opportunity to dispute their debt. Defendants claims made the employers more likely to garnish the wages of their employees. The claims indicated to the employers that Defendants had the right to garnish and that they had complied with any prerequisites that may be necessary for such garnishment. The evidence demonstrates that approximately twenty percent of the employers that received the documents with those representations actually garnished wages. Because the misrepresentations affected employers' conduct, the representations were material and violated Section 5 of the FTC Act.

**B. Unfair Practices**

In addition to alleging that Defendants participated in two deceptive acts or practices under the FTC Act, the FTC also argues that Defendants participated in an unfair act or practice by disclosing consumers' debts to their employers without prior approval from the consumers.

9

To qualify as an unfair practice under the Act, the practice need only cause, or be likely to cause, substantial injury to consumers which is not reasonably avoidable by consumers and not outweighed by countervailing interests to consumers or competition. Disclosing consumers' debts to their employers is likely to cause substantial injury to consumers.

Other courts have recognized that wage assignment clauses and wage garnishment procedures cause substantial harm to consumers. For example, the Circuit Court for the District of Columbia has noted that the FTC "found wage assignments particularly harmful to consumers because they can be invoked without the due process safeguards of a hearing and opportunity to present defenses." *Am. Fin. Servs. Assoc. v. FTC*, 767 F.2d 957, 974 (D.C. Cir. 1985). The following specific injuries to consumers were mentioned in the rulemaking record for the unfair practices provision:

> Employers are hostile to wage assignments due to added administrative costs and burdens and the fear that the employee's job motivation and performance will suffer as a result of the reduction in wages. Moreover, employers tend to view the consumer's failure to repay the debt as a sign of irresponsibility. As a consequence many lose their jobs after wage assignments are filed. Even if the consumer retains the job, promotions, raises, and job assignments may be adversely affected.
>
> . . . Loss of a substantial portion of wages tends to cause further disruption of family finances and may even put at risk the wage earner's ability to provide necessities for the family. . . . The invocation of a wage assignment or just simply the threat of invocation may lead a debtor to enter into costly refinancing, to improvidently default on other obligations, or to forego valid defenses. . . .

*Id.* at 974-75. The FTC summarized the injuries to consumers as "severe, substantial disruption of employment, the pressure that results from threats to file wage assignments, and the disruption of family finances." *Id.* at 975. Based on these findings and conclusions by the FTC, the court concluded that "[t]he harms to consumers resulting from the use of . . . wage assignments

identified by the Commission on the basis of the rulemaking record are neither trivial or speculative nor based merely on notions of subjective distress or offenses to taste," and that the "risk of substantial economic and monetary harm to the consumer" is significant. *Id.* at 975. Therefore, the court concludes that Defendants' practice of disclosing debts and the amount of the debts to consumers' employers qualifies as an unfair practice under the FTC Act.

## II.    Violations of the FDCPA

The FTC also argues that Defendants violated the FDCPA through false representations and through prohibited communications. The FDCPA was enacted to control "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The FDCPA gives the FTC authority to enforce a nonexclusive list of unlawful debt collection practices and establishes liability for a single violation of a single provision. *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993); 15 U.S.C. § 1692k(a).

Defendants argue that the FDCPA does not apply to them, as a lender collecting its own debts, because the FDCPA only applies to debt collectors, which are defined as entities attempting to collect debts "owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6); *Neff v. Capital Acquisitions & Management Co.*, 352 F.3d 1118, 1121 (7th Cir. 2003). The Act does not apply to lenders collecting their own debts. *See Nielsen v. Dickerson*, 307 F.3d 623, 634 (7th Cir. 2002); *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 2d 176, 190 (S.D. Tex. 2007).

In part, Defendants argue that they are not debt collectors under the FDCPA because the FTC describes them as a lender for purposes of the Credit Practices Rule and describes LoanPointe, Eastbrook, and GetECash as a common enterprise offering and extending loans to

consumers.  However, a creditor brings itself within the FDCPA's coverage if "in the process of collecting [its] own debts, [it] uses any name other than [its] own which would indicate that a third person is collecting or attempting to collect such debts."  15 U.S.C. § 1692a(6); *Catencamp v. Cendant Timeshare Resort Group - Consumer Finance, Inc.*, 471 F.3d 780, 781 (7th Cir. 2006).

Defendants agree that a creditor cannot use a name other than its own to collect a debt, but argue that the FDCPA does not apply to "any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control."  15 U.S.C. § 1692a(6)(B).  This, according to Defendants, is exactly how the FTC describes Defendants.  Although Strom argues that all of the Defendants' collection efforts are done in the name of GetECash, Defendants cannot dispute that the wage garnishment package was sent to consumers' employers with a LoanPointe cover sheet, a LoanPointe fax tagline, and a signature by the LoanPointe Garnishment Manager.  These representations on the garnishment package "indicate that a third person is collecting or attempting to collect such debts."  Defendants created the impression that LoanPointe, an entity other than GetECash, was attempting to collect the payday loan.   Because Defendants lent under the name GetECash but collected using the name LoanPointe, they fall within the FDCPA's coverage.

Defendants also argue that the FDCPA does not apply to them because GetECash and LoanPointe are related by common ownership or affiliated by corporate control.  However, this exception only applies "if the principal business of [the person collecting the debt] is not the collection of debts."  15 U.S.C. § 1692a(6)(B); *Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031, 1041 (W.D. Wis. 2002).  Inherent in the payday lending business is collecting on

the loans. Collecting, therefore, is part of Defendants' principal business and the FDCPA applies to Defendants.

The FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. In this case, Defendants falsely represented (1) that they were authorized under the DCIA to garnish the pay of consumers who owed them debts without first obtaining a court order and (2) that Defendants had notified consumers and provided consumers with the opportunity to dispute the debt prior to sending the garnishment requests to the consumers' employers. These misrepresentations qualify as false and misleading collection practices in violation of the FDCPA.

The FDCPA also bars debt collectors from communicating with third parties other than for the purpose of obtaining a consumer's home or workplace address or telephone number, unless the consumer consents to third-party communication or the communication is reasonably necessary to effectuate a post-judgment judicial remedy. 15 U.S.C. § 1692c(b). Prohibited third-party communications include contacts with a debtor's employer or co-workers. *See, e.g., Padilla v. Payco Gen. Am. Credits, Inc.*, 161 F. Supp. 2d 264, 274 (S.D.N.Y. 2001); *Austin v. Great Lakes Collection Bureau, Inc.*, 834 F. Supp. 557, 559 (D. Conn. 1993); *West v. Costen*, 558 F. Supp. 564, 575 (W.D. Va. 1983). Because Defendants communicated with the consumers' employers and co-workers about the consumers' debts without the consumers' knowledge or consent, Defendants violated the FDCPA. Accordingly, the FTC is entitled to summary judgment that Defendants' acts violated the FDCPA.

III.    **Violations of the Credit Practices Rule**

The FTC further argues that Defendants violated the Credit Practices Rule by including

13

an improper wage assignment clause in their credit contracts. The Credit Practices Rule generally prohibits the use of wage assignment clauses, but it allows such clauses to be included if the wage assignment: (i) is, by its terms, revocable at the will of the debtor; (ii) is a payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction, in which the consumer authorizes a series of wage deductions as a method of making each payment; or (iii) applies only to wages or other earnings already earned at the time of the assignment. 16 C.F.R. § 444.2(a)(3).

Defendants' wage assignment clause in its loan application does not meet any of the requirements of the Credit Practices Rule. Even though several consumers refused to allow Defendants to garnish their wages upon request, the wage assignment clause was still not revocable by its terms. Because Defendants' clause was not revocable by its terms, Defendants violated the Credit Practices Rule.

Defendants incorrectly attempt to require the FTC to make an additional showing that the violation is a deceptive or unfair practice. In promulgating the Credit Practices Rule, however, the FTC already found that improper wage assignment clauses are unfair and cause substantial harm to consumers. *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 974-74 (D.C. Cir. 1985). Therefore, the court concludes that summary judgment is appropriate on the issue of whether Defendants violated the Credit Practices Rule.

Defendants dispute the appropriate remedy for a violation of the Credit Practices Rule. Defendants attempt to assert an affirmative defense to their violation of the Credit Practices Rule because they did not know that their wage assignment clause was illegal. However, good faith is not a defense to liability under the FTC Act, in part because the FTC need not prove intent. *See,*

*e.g.*, *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006); *Freecom*, 401 F.3d at 1202; *Removatron Int'l*, 884 F.2d at 1495; *World Travel Vacation Brokers*, 861 F.2d at 1029. In addition, reliance on others, including counsel, is no defense to FTC Act liability. *Cyberspace.com*, 453 F.3d at 1202; *Amy Travel*, 875 F.2d at 575.

Good faith, however, may be relevant in determining the scope of injunctive relief because permanent injunctions are only appropriate if "there exists some cognizable danger of recurrent violation." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Whether there is a danger of a recurrent violation is determined by looking at two factors: 1) the deliberateness and seriousness of the present violation and 2) the violator's past record with respect to unfair advertising practices, *Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982). Good faith on the part of a defendant could be relevant to the first factor. *Hang-Up Art. Enter.*, 1995 U.S. Dist. LEXIS 21444 at *10-11.

Defendants' ignorance of the Credit Practices Rule does nothing to negate the need for permanent injunction in this case because not knowing that the clause was illegal does not lessen the deliberateness or seriousness of the conduct, *see Jerman v. Carlisle, McNellie, Rini, Kramer, & Ulrich LPA*, 130 S. Ct. 1605, 1612 (2010), and because Defendants should have been diligent in understanding the law relating to their chosen line of business. Therefore, Defendants' good faith defense reinforces, instead of excuses, the need for permanent injunctive relief to ensure that consumers are not harmed in the future.

## IV. Remedies

The FTC argues that if the court finds that a defendant has violated any provision of law that the FTC enforces, the court has the authority to issue whatever equitable relief that it sees fit,

including permanent injunctive relief and monetary relief such as restitution or disgorgement of unjust enrichment. *Pantron I*, 33 F.3d at 1102; *Amy Travel*, 875 F.2d at 573; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982); *Sec. Rare Coin & Bullion*, 931 F.2d at 1314-15. The Tenth Circuit has recognized that "[a]lthough § 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress. In cases where the FTC seeks injunctive relief, courts deem any monetary relief sought as incidental to injunctive relief." *FTC v. Freecomm Communications, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005).

The FTC argues that both the corporate defendants and Strom are liable for the injunctive and monetary relief. "When one or more corporate entities operate as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002). A common enterprise may exist where companies share common control, office space, employees, interrelated funds, and other factors. *See, e.g., FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000). Where the same individuals transact business through a "maze of interrelated companies," all of them may be held liable as a joint enterprise. *See id.* (quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964)).

Because the Defendants have shared ownership and control, office space and addresses, and employees, they are a common enterprise and are liable for injunctive relief and, jointly and severally, for monetary relief.

In addition, the FTC argues that Strom is liable for injunctive and monetary relief for

violations committed by Eastbrook and LoanPointe. For an individual to be liable for an injunction, the individual must either have authority to control the unlawful activities or participate in the illegal activities directly. *Freecom*, 401 F.3d at 1205. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1231 (9th Cir. 1999); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996); *Amy Travel*, 875 F.2d at 574. A corporate officer is presumed to be in control of a small, closely held corporation, *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir.), and assuming the duties of a corporate officer is probative of an individual's participation or authority. *Amy Travel*, 875 F.2d at 573; *Five-Star Auto Club*, 97 F. Supp. 2d at 538.

An individual may be held liable for monetary redress of corporate practices if the individual had, or should have had, knowledge or awareness of the corporate defendants' misrepresentations. *Freecom*, 401 F.3d at 1207; Affordable Media, 179 F.3d at 1231; Gem Merch., 87 F.3d at 470; Amy Travel, 875 F.2d at 574. The knowledge element need not rise to the level of subjective intent to defraud consumers. *Freecom*, 401 F.3d at 1207; *Affordable Media*, 179 F.3d at 1234; *Amy Travel*, 875 F.2d at 574. The individual need only have actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud coupled with the intentional avoidance of the truth. *Affordable Media*, 179 F.3d at 1234; *Amy Travel*, 875 F.2d at 574. Participation in corporate affairs is probative of knowledge. *Affordable Media*, 179 F.3d at 1235; *Amy Travel*, 875 F.2d at 564.

Because Strom had the authority to control the corporations' activities, and did in fact participate in their activities, and because he had knowledge of the corporations' wrongful acts, he is individually liable for both injunctive and any monetary relief the court may award.

Permanent injunctions are appropriate only if "there exists some cognizable danger of recurrent violation." *United States v. W.T.Grant Co.*, 345 U.S. 629, 633 (1953). Although Defendants claim good faith in violating the law, because they obtained advice from counsel and stopped their conduct when notified by the government, the fact that Defendants were unaware of the law in their chosen line of business, even with the assistance of counsel, makes the danger of recurrent violations likely. Defendants' inability to demonstrate that they are capable of understanding the law relating to credit practices and debt collection makes a permanent injunction, with monitoring by the FTC, a proper remedy in this case. Therefore, the court grants the FTC's requests with respect to these forms of relief.

Defendants admit that the court has broad equitable authority to grant injunctive and ancillary relief, including monetary relief in the form of either restitution or disgorgement. Defendants, however, argue that disgorgement is an unfair remedy in this case.

Disgorgement is generally used to "deprive a wrongdoer of unjust enrichment and to deter others from violating . . . laws by making violations unprofitable." *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006) (internal quotation marks omitted). The primary purpose of disgorgement is to deprive the wrongdoer of his ill-gotten gains. *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 213 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010)**;** *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469-70 (11th Cir. 1996); *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972); *C.F.T.C. v. Hunt*, 591 F.2d 1211, 1222 (7th Cir. 1979).

The FTC agrees that the purpose of disgorgement is to deprive the wrongdoer of his ill-gotten gains but argues that "disgorgement should include all gains flowing from the illegal

activities." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 n.8 (9th Cir. 2010).  In addition, the FTC

argues that it does not need to tie disgorgement to actual consumer loss.  *See SEC v. Blavin*, 760

F.2d 706, 713 (6th Cir. 1985).  Defendants collected a total of $3,013,044 from consumers on

loans with a wage assignment clause that violated the Credit Practices Rule.  Because only

$976,107.54 represents principal consumers repaid to Defendants, the FTC claims that the

remaining $2,036936.67 represents Defendants' gains "flowing from [their] illegal activities."

Therefore, the FTC argues that they are entitled to judgment in the amount of $2,036,936 as

monetary relief for Defendants' violations of the Credit Practices Rule.  Moreover, the FTC

argues that it is entitled to at least the $468,020.91, which the Defendants took in through their

garnishment package that violated the FTC Act and the FDCPA.

Defendants point out that courts have distinguished between legally and illegally obtained

profits when considering the amount of disgorgement.  *FTC v. Verily Int'l, Ltd.*, 443 F.3d 48, 70

(2d Cir. 2006); *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).  In this

case, Defendants argue that they did not collect any money that was not owed, and they were not

unjustly enriched by deceptive practices that induced a consumer to act to its detriment.  *See FTC

v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997); *FTC v. Figgie Intern., Inc.*, 994 F.2d 595 (9th Cir.

1993).  Defendants assert that requiring them to disgorge amounts paid for repayment of loans

would amount to a penalty, not simply a prevention of unjust enrichment, *see Febre*, 128 F.3d at

536-37; *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (quoting *SEC v. Blatt*,

583 F.2d 1325, 1335 (5th Cir. 1978)), and, therefore, it is beyond the scope of fair equitable

relief.

The court's equitable power may only be exercised over property that is causally related

to the illegal actions of the defendant.  *SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993), *aff'd* 29 F.3d 689 (D.C. Cir. 1994).  In this case, Defendants argue that the borrowers suffered no injury because any moneys they paid to Defendants were due and owing.  Consumers who applied for payday loans with Defendants agreed to pay back the loan amount and interest at rates identified in the terms of repayment.  Although the portion of the terms of repayment allowing Defendant to garnish the consumers' wages was inappropriate, there is no argument in this case that the other terms of repayment were misleading, deceptive, or inappropriate.

Determining equitable monetary relief in this case, therefore, requires the court to balance the need to hold Defendants accountable for deceptive practices with Defendants' right to repayment of the loans.  The consumers who repaid their loans according to the terms of repayment were not impacted by the inappropriate garnishment clause.  While a garnishment notice was included in the loan application materials, those consumers agreed to the loan and interest terms and complied with those terms in repaying their loans.  There is no basis for concluding that the garnishment clause had anything to do with their repayment of the loans.

The only consumers who were possibly impacted by the inappropriate garnishment clause are the consumers who had garnishment letters sent to their employers.  Defendants received $468,020.91 through garnishment.  While the garnishment letter violated federal law, the court does not believe that Defendants should be required to disgorge the principal loan amounts.  To the extent that disgorgement applies to "ill-gotten gains," a return of the loan principal lent to the consumer is not actually a "gain" to Defendants.  The court, therefore, concludes that the only amounts that can be considered to be "ill-gotten gains" or "gains flowing from the illegal activities" are the interest amounts received through the inappropriate garnishments.

Technically, Defendants may have been entitled to the interest payments under the terms of the loans. But, requiring Defendants to disgorge the interest they received through garnishment fulfills one of the purposes of disgorgement, which is to make violations unprofitable. If Defendants were subject to only an injunction, the resulting message would be that improper wage assignment clauses can be included in loan applications until discovered, at which point, the only consequence would be to stop violations of the law in the future. By disgorging the interest gained through the inappropriate garnishments, the more appropriate result is that the violation is unprofitable. This disgorgement also serves to equalize the marketplace. Defendants' violations should not allow them to profit more than other similar businesses who have complied with the law.

Therefore, after considering the equities of the case at hand, the court awards the FTC monetary relief in the amount Defendants received through garnishment, $468,020.91, minus any amount in that figure that represents the repayment of principal on the loans in question. Accordingly, the court requests the FTC to submit within ten days of the date of this Memorandum Decision and Order a Judgment that provides for its requested permanent injunction, monitoring requirements, and monetary relief in the amount of interest paid as a result of garnishment (i.e., $468,020.91 minus any principal repayment within that amount).

### Motions to Reopen Discovery and for Relief from FTC's Second Set of Requests for Admissions

Defendants asks this court to reopen discovery because they claim that the FTC altered its claim one day before filing its motion for summary judgment and fifteen days after discovery had closed. In addition, Defendants seek to have the FTC's Second Set of Requests for Admissions not deemed admitted because Defendants effectively answered, in all factual respects, in the

21

FTC's First Set of Requests and because Defendants have now answered and served the Second Set of Requests.

**I. Motion to Reopen Discovery**

Defendants argue that the court should reopen discovery because the FTC altered its claim from seeking monetary relief for only loan payments received by Defendants through voluntary garnishments of wages of borrowers to seeking monetary relief for all monies paid to the Defendant by any borrower who applied for a loan using the loan application with the illegal wage assignment clause. This change in the FTC's claims increased the amount of money that the FTC requested be disgorged from $468,020.91 to $3,013,044.

Given the court's ruling on the monetary relief requested by the FTC, much of this argument is moot. However, the court will analyze the motion on its merits. The facts demonstrate that the FTC did not radically change its claim against Defendants. On October 4, 2010, months before discovery closed or the FTC served its Amended Initial Disclosures, the FTC disclosed in an email to Defendants' counsel that it would seek a much larger sum of money. In that e-mail, the FTC stated that, if the case did not settle, the FTC would "move for summary judgment and request a much larger sum based on all money received by the companies that contained an unlawful wage assignment clause." Even though Defendants received this e-mail nearly four months before discovery closed, Defendants took no discovery from the FTC.

The FTC also amended its disclosures in a fair and timely manner. Both the initial and the Amended Scheduling Orders provided for a discovery deadline with an additional two weeks in which the parties could supplement their Rule 26 discovery disclosures. The FTC filed its Amended Initial Disclosure in accordance with the Amended Scheduling Order.

Finally, the court concludes that Defendants did not demonstrate any need for further discovery. The discovery Defendants seek is equally relevant under either of the FTC's theories of monetary relief. Defendants could have conducted the desired discovery during the nearly four months of discovery still available after the FTC sent the e-mail. Moreover, Defendants already possess the information regarding their own customers. Accordingly, even if the request was not largely mooted by the court's ruling regarding the appropriate monetary relief in this case, the court concludes that Defendants did not demonstrate a basis for reopening discovery. Accordingly, Defendant's motion is denied.

## II. Motion to Have Requests for Admissions Not Deemed Admitted

Again, the court's ruling on the merits of the FTC's Motion for Summary Judgment has essentially made this motion moot. Nevertheless, the court will also address the motion on its merits. Under Rule 36(a), "[a] party may serve upon any other party a written request for the admission of the truth of certain matters. If the receiving party fails to respond to the request within 30 days, or within such other time as the court may allow, the matter is deemed admitted." Fed. R. Civ. P. 36(a). Once a matter is admitted, it "is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Fed. R. Civ. P. 36(b). The court may permit withdrawal or amendment "when (1) the presentation of the merits of the action will be subserved thereby and (2) the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." *Id.*

In this case, Defendants contested the facts in the FTC's First Set of Requests but failed to respond to the legal conclusions relating to those contested facts in the Second Set of

Requests.  The FTC, however, was well aware that Defendants contested liability under the

FDCPA.  Defendants' situation is distinguishable from the cases cited by the FTC because those

cases involved defendants who were uncooperative during discovery in ways other than simply

failing to respond to requests for admission.  In addition, the FTC has failed to demonstrate that

it would be prejudiced if the Second Set of Requests were not deemed admitted, as required by

Rule 36(b).  Finally, there is no evidence that Defendants' delay in answering was willful

because Defendants believed the Second Set of Requests was part of the settlement discussions,

which ended without a settlement.  There was nothing improper with the FTC propounding a

Second Set of Requests relating to the contested legal issues and the court recognizes that the

language of Rule 36 is self-executing and Defendants took a risk in not answering the Second Set

of Requests, but there was obviously a lack of communication between counsel regarding the

discovery and the settlement discussions.

　　　The Second Set of Requests, if deemed admitted, would eliminate the need to decide the

case on the merits in every regard except the proper amount for a remedy.  Because the Second

Set of Requests required the Defendants to admit to liability under all of the FTC's claims and

negated Defendants' good faith defense, deeming the requests to be admitted would "practically

eliminate any presentation of the merits of the case."  *Raiser v. Utah County*, 409 F.3d 1243,

1246 (10th Cir. 2005).  This court always prefers to hear matters on the merits.  In this case, the

court has decided the FTC's motion for summary judgment on the merits.  It is obvious that a

withdrawal of the admissions would not, and in fact did not, prejudice the FTC "in maintaining

the action or defense on the merits."  Even though the motion is largely moot because the court

has decided the motion on the merits, the court concludes that it is appropriate to grant

Defendants' request to withdraw the admissions from the FTC's Second Set of Requests.

**CONCLUSION**

Based on the above reasoning, Plaintiff Federal Trade Commission's Motion for Summary Judgment is GRANTED as discussed above and the FTC shall submit a Judgment in accordance with the court's decision within ten days of the date of this Memorandum Decision and Order. Defendants' Motion to Reopen Discovery is DENIED, and Defendants' Motion for Relief from Having the FTC's Second Set of Requests for Admission "Deemed Admitted" and to Have Defendants' Denials Accepted is GRANTED.

Dated this 15th day of September, 2011.

BY THE COURT:

Dale A. Kimball,
United States District Judge